J-S48030-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: THE INTEREST OF: X.E., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.E., MOTHER | : | No. 446 WDA 2015 |

Appeal from the Decree entered February 18, 2015,
Court of Common Pleas, Allegheny County,
Orphans' Court at Docket No. TPR 071 of 2014

---

| | | |
|---|---|---|
| IN RE: THE INTEREST OF: J.S., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.E., MOTHER | : | No. 447 WDA 2015 |

Appeal from the Decree entered February 18, 2015,
Court of Common Pleas, Allegheny County,
Orphans' Court at Docket No. TPR 070 of 2014

BEFORE:  PANELLA, DONOHUE and WECHT, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED AUGUST 11, 2015**

K.E. ("Mother") appeals from the February 18, 2015 decrees entered by the Allegheny County Court of Common Pleas granting the petitions filed by the Allegheny County Office of Children, Youth and Families ("CYF") to involuntarily terminate her parental rights ("TPR") to her son, J.S., and daughter, X.E., (collectively "Children") pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8) and (b).[1]  After careful review, we affirm.

---

[1]  On the same date, the orphans' court also involuntarily terminated the parental rights of J.S.'s father, E.D.S., and the alleged father of X.E., S.C.,

The relevant factual and procedural histories of this case,[2] as gleaned from the stipulations of the parties entered at the termination hearing, are as follows:

**HISTORY OF CASE UP TO TPR:**

1. [J.S.] was born [in] June [] 2007 to Mother [] and [E.D.S.] in Allegheny County, Pennsylvania.

2. [X.E.] was born [in] October [] 2009 to Mother [] in Allegheny County, Pennsylvania.

* * *

5. A referral was made to CYF on March 9, 2009 that Mother had left [J.S.] with caretakers for a long period of time and could not be located.

6. A referral to Family Group Decision Making [] was made on July 22, 2009.

7. CYF [s]ervices were utilized for the family from August 13, 2009 through November 18, 2009[,] when they were discontinued. [J.S.] had obtained medical care and insurance and [X.E.] was doing well in the home.

8. A referral was made to CYF on December 18, 2009 after [X.E.] was admitted to Allegheny General Hospital for dehydration and [f]ailure to [t]hrive. On December 20, 2009, [X.E.] was discharged from the hospital into the care of Mother and in-home services were put in place.

---

as well as the unknown father of X.E., pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2) and (b). None of the fathers appealed from the orphans' court's decrees terminating their parental rights.

[2] As none of the fathers appealed, we omit from our discussion the propriety of these decrees and the facts attendant thereto.

9.  Mother worked with Greater Valley Community Services Inc. to obtain an apartment and furniture, secure daycare for [C]hildren, apply for WIC, take [C]hildren to doctor appointments, enhance parenting, obtain birth control, learn budgeting and CPR.

10. Greater Valley Community Services Inc. began working with Mother on December 29, 2009 and closed their case on March 20, 2010.

11. A referral was made to CYF on June 1, 2010 that Mother was not caring for [X.E.] properly; that Mother lacked formula, leaves [X.E.] in a soiled diaper all day, does not have furniture[,] smokes marijuana and drinks alcohol.  This referral was unfounded.

12. A referral was made on September 3, 2010 that Mother left [C]hildren with [a] caregiver for an extended period of time and could not be located, and that Mother has no idea how to care for [C]hildren.

13. An [e]mergency [c]ustody [a]uthorization was obtained on September 3, 2010 and [C]hildren were taken into protective custody by CYF.

14. A [s]helter [h]earing was held on September 7, 2010.  The [c]ourt found there was not sufficient evidence to keep [C]hildren in the custody of CYF.  A [s]helter [o]rder returned [C]hildren to Mother and in-home services were put into place.

15. An FSP dated November 1, 2010 and signed by Mother indicated that Mother was working with Three Rivers Youth In-Home Services on the following items[:] parenting skills, keeping the home safe, obtaining medical care for [C]hildren, maintaining safety in [the] home, ensuring Mother was to be the primary caregiver for [C]hildren and Mother not to leave [C]hildren with others for long periods of time.

16. Mother was evicted from her apartment on November 19, 2010 for non-payment of rent.

17. Mother was permitted to stay with [K.E. ("Maternal Grandmother")], but [Maternal Grandmother] would not permit Mother's paramour, [D.B.], to reside in her home. [Maternal Grandmother] was worried about his behaviors. Mother then decided to reside in a Holy Family [s]helter with [D.B.]

18. On February 7, 2011, [Maternal Grandmother] applied for, and was granted, custody of [C]hildren through [f]amily [c]ourt.

19. A referral was made on May 26, 2011 [to CYF] that [X.E.] had bruises on her buttocks and lower back.

20. On May 26, 2011, an [a]pplication for [e]mergency [p]rotective [c]ustody was issued, and [Children] were brought into CYF custody. CYF's concerns were that [Maternal Grandmother] did not protect [X.E.] from harm, and the risk of [J.S.] not being protected from harm.

21. A [s]helter [c]are [h]earing was held on May 27, 2011[,] and a [s]helter [o]rder was issued for [C]hildren to stay in CYF custody. The [c]ourt further ordered a forensic exam of [X.E.], a clothing stipend, a safety plan to be put into place, in-home services for [Maternal Grandmother], visits three times a week for Mother and [Maternal Grandmother], and directing no contact of [D.B.] with [C]hildren.

\* \* \*

23. A[n] FSP signed by Mother and [Maternal Grandmother] on July 13, 2011 listed the following goals[:] [maintain] contact with CYF, visits [with Children], urine screens for Mother, no contact with [D.B.], Mother as primary caregiver, [d]omestic [v]iolence [e]ducation for Mother; [D.B.] to attend anger management[,] [Maternal Grandmother], [sic]

safety and housing for [C]hildren, prevent further abuse and neglect[.]

24. Orders of [a]djudication and [d]ispostion finding [C]hildren dependent were filed on August 10, 2011 after a hearing held on August 9, 2011 in front of Judge Michael Marmo.

25. At the [a]djudication hearing, the parties stipulated that there was bruising on [X.E.]

26. At the adjudication hearing, Mother testified that [X.E.] may "have fell" [sic] and that her daughter "is a tomboy" who is "really rough" and that Mother had "seen bruises on her knees, her elbows" and that Mother did not know what happened to cause the bruising.

27. At the adjudication hearing, [Maternal Grandmother] testified [to] the following about the bruising on [X.E.]: "When that baby left me, there was nothing on her. I didn't notice anything. And I gave her a bath and changed her."

28. It has been CYF's assertion throughout the case that [D.B.] may have been the person who caused injury to [X.E.]

29. Throughout the life of the case, Mother has made some progress on her FSP [goals].

  a. She completed Arsenal Family and Children Supervised Parenting and Play Program between October 2011 and January 2012. She was recommended to benefit from further services. [She completed an additional eight classes in May 2012].

  b. In the summer of 2012, Mother completed a non-offenders course at the Women's Center & Shelter. CYF asked Mother to take another domestic violence course in August of 2013 but Mother refused.

c. Mother has remained exposed and subject to domestic violence over the life of the case.

d. Mother did not attend any drug and alcohol services. She completed an evaluation at Power in the spring of 2013 and was recommended for intensive outpatient treatment. She was placed on a waiting list for uninsured persons.

e. Mother has been employed fairly regularly throughout the case at places such as Steak 'n Shake and Wendy's.

30. Mother and [D.B.] participated in parenting classes for six to eight weeks in the summer of 2012 with Scott Flurry, a family counselor at Holy Family.

31. Documentation in the case shows the following urine screen test results: Mother was called for a total of forty-one [] random drug screens; out of the forty-one [] screens, fifteen [] showed a negative result, there were twenty-one [] no shows, four [] positive for marijuana, and one [] refusal to take the screen. The dates for the positive tests are[:] November 29, 2010, March 12, 2013, September 24, 2013 and May 21, 2014.

**KIDS/HEALTH/PLACEMENTS:**

32. [Children] have been in CYF custody since May 26, 2011. This is a total of three years and seven months, or forty-three [] consecutive months.

33. [Children] have had [three] placements during their time in CYF custody.

34. [C]hildren were with the [C.] family of Project Star from May 26, 2011 until August 26, 2011. This placement disrupted due to non-compliance [with] the visitation plan by [Maternal Grandmother].

35.    [C]hildren were with the [B.] family of Project Star from August 27, 2011 until September 1, 2011.  This placement disrupted due to [J.S.] and another foster child having been found in a bedroom with their pants down.

36.    [C]hildren were placed with the [D.] family of Project Star on September 2, 2011 and have remained there to the present day.

37.    When [J.S.] came into care, he was almost four years old[.] [J.S.] had serious medical needs upon coming into care as a result of not being taken to the pediatrician regularly.

38.    [J.S.] had developmental delays, sleep apnea, his speech was difficult to understand, had trouble eating and drinking, he was not potty trained and had significant eyesight issues.

39.    [J.S.] had a surgery on May 1, 2012 to have his adenoids and tonsils removed and tubes placed in his ears.  [J.S.] also underwent sleep studies, genetic profiling, an eye patch, vision therapy, occupational therapy, outpatient mental health therapy and is now potty trained.

40.    [X.E.] currently attends outpatient mental health therapy and is up[] to[] date on her pediatrician visits.

**VISITATION INFORMATION**

41.    In 2011, Mother was offered forty-three [] visits with [C]hildren through Project Star.  Documentation shows Mother had two [] weekend visits and attended thirty-six [] day visits; one [] visit was cancelled by Mother; one [] was cancelled due to Mother's failure to confirm and two [] were cancelled by Project Star.

*    *    *

43.    In 2012, Mother was offered sixty-two [] visits facilitated through Project Star. Documentation shows: Mother had eight [] weekend unsupervised [visits] in her home, attended fifty-two [] day visits, one [] visit was cancelled per Mother and one [] visit is unclear as to its occurrence.

* * *

45.    In 2013, Mother was offered sixty-nine [] visits facilitated through Project Star. Documentation shows: three [] weekend visits attended and one [] weekend cancelled by mutual decision of Mother and Project Star; fifty-four [] day visits attended by Mother, seven [] day visits cancelled due to lack of Mother's confirmation and four [] cancelled by Project Star due to various issues[.]

46.    In 2014, Mother was offered fifty-three [] visits through Project Star. Documentation shows: thirty-three [] day visits attended, thirteen [] visits cancelled due to lack of confirmation by Mother, three [] visits were confirmed but Mother failed to show, one [] cancelled by Mother and two [] visits cancelled due to sick children. … Mother's total offered visitations documented for 2014 (not including cancellations for sick children) is sixty-five [] [51 day and 14 weekends] of which [M]other attended forty-seven [].

* * *

49.    Dr. [Terry] O'Hara[, Ph.D.] conducted several individual and interactional evaluations throughout the history of the case. The reports include the following:

       1. January 2012

              a. Interactional evaluations of [C]hildren with (a) Foster Mother, (b) Mother, and (c) [Maternal Grandmother]

b. Individual evaluation of [Maternal Grandmother]

c. Individual evaluation of Mother

2. <u>May 2012</u>

a. Individual evaluation of [D.B.]

3. <u>August 2012</u>

a. Interactional evaluations of [C]hildren with (a) Foster Parents, [] (b) Mother and (c) [D.B.]

b. Individual re-evaluation of Mother

\* \* \*

4. <u>August/September 2013</u>

a. Interactional re-evaluation of [C]hildren with … [Maternal Grandmother] (8/[26]/13) [and] Mother (9/03/13)

b. Individual re-evaluation of Mother (9/3/13) [and Maternal Grandmother (8/13/13)]

\* \* \*

5. <u>November 2013</u>

a. Individual evaluation of maternal great-uncle, [M.E.]

6. <u>January 6, 2014</u>

a. Interactional evaluation of [C]hildren with [Maternal Grandmother] and her paramour, [W.H.]

7. <u>[June 2014]</u>

a. [Interactional re-evaluation of Children with Foster Parents, Mother, and Maternal Grandmother]

> b. [Individual re-evaluation of Mother and Maternal
>    Grandmother]
>
> c. [Individual evaluations of Children]

CYF Exhibit 1 (Stipulations), ¶¶ 1-49.

On April 21, 2014, CYF filed petitions to involuntarily terminate Mother's parental rights to Children. The orphans' court took testimony on the petitions on January 23, 2015. On February 18, 2015, the juvenile court held a dependency proceeding at which the juvenile court changed Children's permanency goal from reunification to adoption and ordered that Children shall remain in the care of their foster parents, with Maternal Grandmother to have continued unsupervised visitation with Children. Thereafter, the orphans' court reconvened the termination proceeding and entered its decision terminating Mother's rights to Children on the record.

Mother filed a timely notice of appeal from the TPR decrees on March 17, 2015, and concomitantly filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court issued a responsive written opinion on May 15, 2015.[3]

On appeal, Mother raises the following issues for our review, which we have reordered for ease of disposition:

---

[3] We note that the briefing schedule on appeal in this case was delayed by more than a month because of the orphans' courts' failure to timely author its opinion and forward the certified record to this Court. *See In re T.S.M.*, 71 A.3d 251, 261 n.21 (Pa. 2013) (admonishing this Court for failing to explain delays that occurred in a children's fast track case).

A. Did the [orphans' court] abuse its discretion and err in granting the [TPR petitions] pursuant to 23 Pa.C.S.A. §2511(a)(2) and (8) of the Adoption Act?

B. Did the [orphans' court] abuse its discretion and err in not determining specifically by clear and convincing evidence that [C]hildren would not be adversely affected by severance of the strong bond extant between [Mother] and [C]hildren?

C. Did the [orphans' court] abuse its discretion and err as a matter of law in determining that [TPR] pursuant to 23 Pa.C.S.A. §2511(a)(2) and (a)(8) of the [A]doption [A]ct best serves the needs and welfare of [C]hildren?

D. Did the [orphans' court] abuse its discretion and err as a matter of law in determining that [TPR] pursuant to 23 Pa.C.S.A. §2511(a)(2) and (a)(8) of the [A]doption [A]ct was in the best interests of [C]hildren?

E. Did the [juvenile court] abuse its discretion and err as a matter of law in determining that placement with the foster parents in this case (and adoptive resource) would be in the best interests of [C]hildren?

F. Did the [juvenile court] abuse its discretion and err as a matter of law in not determining that [C]hildren should not be placed with [] Maternal Grandmother under a subsidized [l]egal [c]ustodian agreement?

Mother's Brief at 6-7.[4]

---

[4] Contrary to our Rules of Appellate Procedure, Mother does not divide the argument section of her appellate brief "into as many parts as there are questions to be argued[.]" Pa.R.A.P. 2119(a). Because of the manner by which we decide this appeal, this defect is not so substantial that we must suppress her brief or quash the appeal. **See** Pa.R.A.P. 2101.

The first four issues raised by Mother all challenge the orphans' court's decision to terminate her parental rights to Children. We review a decree terminating a parent's rights for an abuse of discretion or error of law. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). We must accept the credibility determinations and factual findings of the trial court that are supported by the record. *Id.* This Court may not reverse a termination decree simply because we would have reached a different result based on the same facts. *Id.*

Under section 2511 of the Adoption Act, the trial court must engage in a bifurcated process. First, the trial court must examine the parent's conduct under section 2511(a). *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006). The burden of proof is on the petitioner to establish by clear and convincing evidence the existence of grounds for termination under section 2511(a). *In re J.L.C. and J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003). If termination is found by the trial court to be warranted under section 2511(a), it must then turn to section 2511(b), and determine if termination of the parent's rights serves the children's needs and welfare. *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).

This Court need only agree with the trial court's decision as to any one subsection of section 2511(a) in order to affirm the termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863

- 12 -

A.2d 1141 (Pa. 2004). We will therefore examine the facts under section 2511(a)(8), which states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>          \*    \*    \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). We will address each of the three elements seriatim.

Beginning with the first element, it is uncontested that Children have been out of Mother's care for well over twelve months. As the parties stipulated, Children have been in CYF's care continuously since May 26, 2011. CYF Exhibit 1 (Stipulations), ¶ 32. CYF filed its TPR petition on April 21, 2014. As such, the first prong of 2511(a)(8) is inarguably met.

Turning to the second element, we recognize that "termination under subsection (a)(8) 'does **not** require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of [the] child[].'" ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009) (quoting ***In re Adoption of R.J.S.***, 901 A.2d at 511)) (emphasis in the original). The relevant questions

- 13 -

under the second prong are whether the parent has remedied the conditions that led to the placement of the child, whether those efforts were first initiated prior to filing the petition to terminate the parent's rights, and whether the child's reunification with that parent is imminent at the time of the termination hearing. *See* 23 Pa.C.S.A. § 2511(b); *In re I.J.*, 972 A.2d at 11; *see, e.g.*, *In re Adoption of R.J.S.*, 901 A.2d at 512 (termination under (a)(8) was appropriate where Mother was not in a position to parent her children at the time of the termination hearing).

The record reflects that CYF removed Children from Maternal Grandmother, who had custody of Children through the family division, based upon concerns that Maternal Grandmother was unable to adequately protect Children. CYF Exhibit 1 (Stipulations), ¶¶ 18-20. The juvenile court ordered Children's placement in foster care because of concerns about Mother's ability to care for Children. At the time of the 2011 removal, CYF had been involved with Mother and Children for several years. *Id.*, ¶¶ 5-17. Following the 2011 removal, CYF set goals for Mother to effectuate the return of Children to her care, including, inter alia, domestic violence counseling and negative urine screens. *Id.*, ¶ 23; CYF Exhibit 4 (FSP signed July 13, 2011). The orphans' court found significant Mother's failure to successfully complete these goals in deciding that CYF had satisfied its burden of proving that Mother's rights to Children should be terminated

pursuant to 23 Pa.C.S.A. § 2511(a)(8).  Orphans' Court Opinion, 5/15/15, at 5-7.

We begin with the goal of completing domestic violence counseling. Although Mother completed domestic violence counseling at the Women's Center and Shelter in 2012, the record reflects that Mother continued to be a victim of domestic violence thereafter.  CYF Exhibit 1 (Stipulations), ¶¶ 29(b)-(c); CYF Exhibit 5 (Dr. O'Hara's Report of August/September 2013), at 2 (stating that Mother was living with X.E.'s alleged father, S.C., who had a history of domestic violence, and that Mother has been observed "to have bruises up and down her arms as well as on her face"); CYF Exhibit 5 (Dr. O'Hara's Report of June 2014), at 2 (indicating that visits between Mother and Children became supervised in February 2014 because "[M]other obtained a PFA on her paramour, [D.B.], for physically assaulting [M]other"). Mother was not forthright about the existence of domestic violence in her relationships and refused to participate in any further domestic violence counseling.  CYF Exhibit 1 (Stipulations), ¶ 29(b); CYF Exhibit 5 (Dr. O'Hara's Report of January 2012), at 12 (Mother denied domestic violence with D.B., stating that she has bruises because she's "really clumsy"); CYF Exhibit 5 (Dr. O'Hara's Report of August 2012), at 6-7 (Mother discussing her domestic violence counseling and stating that it did not really address domestic violence and that she did not believe she needed such counseling); CYF Exhibit 5, (Dr. O'Hara's Report of August/September 2013), at 13

(Mother denied domestic violence with S.C., claiming the bruises were from "play[ing] around and wrestl[ing]" and "sucker bites," but finally admitting that "there was a lot of domestic violence altercations" in her relationship with D.B.). Thus, at the time of the TPR hearing, Mother had not adequately addressed her domestic violence goal.

Regarding Mother's urine screens, the record reflects that Mother was to participate in a drug and alcohol assessment if she tested positive for controlled substances and follow any recommendations for treatment. *See* CYF Exhibit 4 (FSPs); N.T., 1/23/15, at 11, 22. Mother either did not appear for or refused to participate in twenty-two urine screens and tested positive for marijuana at four of the screens. CYF Exhibit 1 (Stipulations), ¶ 31. Mother participated in a drug and alcohol evaluation, which recommended that she participate in intensive outpatient drug and alcohol treatment, in which she failed to enroll or participate. *Id.*, ¶ 29(d); N.T., 1/23/15, at 11.

In her testimony, Mother acknowledged that Power recommended that she participate in intensive outpatient treatment, but testified that the treatment conflicted with her work schedule and that "they weren't really trying to push it," and determined that Mother only needed to stay in contact with her Power mentor. N.T., 1/23/15, at 48. Mother presented no documentation or additional testimony to support this claim.

Moreover, the record reflects that Mother was still actively using drugs throughout the time Children were in CYF's care, up to and including the TPR

hearing. *Id.* at 64 (Mother testifying that she might test positive for marijuana if she underwent a urine screen that day); CYF Exhibit 1 (Stipulations), ¶ 31 (reflecting that Mother tested positive for marijuana on November 29, 2010, March 12, 2013, September 24, 2013 and May 21, 2014). Therefore, Mother did not address this goal.

Based on the testimony presented, it is clear that Mother not only failed to remedy the circumstances that led to Children's placement in foster care, but she failed, in part, ever to address these issues. As such, the second element of subsection (a)(8) was satisfied.

Turning to the third prong under (a)(8), the record supports a finding that terminating Mother's parental rights will meet Children's needs and welfare. Dr. O'Hara provided the following opinion in his June 2014 report:

> [Mother] tested positive for cannabis in September and May and this is representative of poor coping skills and an inability to remain clean when clearly knowing what is at stake for her. She has not participated in treatment through Power and she acknowledged a significant domestic violence history with [D.B.] She was also involved with [S.C.] who has a reported history of assault and, as mentioned in her prior evaluation, she minimized the bruises on her body, during her apparent relationship with [S.C.] [Mother] Clearly lacks support and her responses on the PAS were representative of anger management concerns, externalization of responsibility, impulsivity, and substance abuse. [Mother] acknowledged "lashing out" when angered and she discussed a recent incident of wanting to fight another adult whom she encountered on the street.

\* \* \*

> [Mother] is not in any position to appropriately care for [C]hildren at this time or appropriately meet their needs and welfare, and [C]hildren have been out of her care for approximately three years. [Mother] is not currently in any treatment and she has not appropriately addressed her domestic violence and anger management concerns. [C]hildren would be at risk for exposure to substance abuse and domestic violence as well as psychological disruption if returned to her care at this time. They would consequently be at risk for anxiety, depression, and reactive attachment concerns. For these reasons, this examiner advises for [Mother's] parental rights to be terminated.

CYF Exhibit 5 (Dr. O'Hara's Report of June 2014), at 32-33. The orphans'

court found Dr. O'Hara's opinions to be credible. Orphans' Court Opinion,

5/15/15, at 6.

We therefore find that the record supports the trial court's finding of

clear and convincing evidence to terminate Mother's parental rights pursuant

to section 2511(a)(8). We now turn to subsection (b), which states:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

Under section 2511(b), we inquire whether termination of parental

rights would best serve the developmental, physical and emotional needs

- 18 -

and welfare of the child. *In Re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted). The trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (citation omitted).

As our recitation of the facts reflects, there have been a plethora of evaluations conducted by Dr. O'Hara assessing Children's interaction and attachment to the various caregivers involved in this case. *See generally* CYF Exhibit 5 (Dr. O'Hara's Reports). In June of 2014, Dr. O'Hara noted some positive interaction between Mother and Children, but did not conclude that Children were securely attached to Mother. CYF Exhibit 5 (Dr. O'Hara's Report of June 2014), at 32-33. Rather, Dr. O'Hara found that Children were securely attached to their foster parents and that Children have "thrived and remarkably progressed" in their care. *Id.* at 36. Dr. O'Hara observed the foster parents to "present with stability and strong parenting skills," and recommended "that it is in [C]hildren's best psychological interest to remain primarily with the [Ds] and be adopted by them[.]" *Id.* Relying on Dr. O'Hara's conclusions, the orphans' court found that

terminating Mother's parental rights to Children met their needs and welfare. Orphans' Court Opinion, 5/15/15, at 8-9.

Mother contests this conclusion, asserting that Dr. O'Hara has historically found that Children have a positive relationship with Mother. Mother's Brief at 11-12, 14. The fact that there is evidence of a bond between Mother and Children, however, does not preclude the trial court from terminating her parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). "Rather, the trial court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* at 898 (quotation and citation omitted). Mother further contends that concerns regarding Children's connection to their cultural heritage should preclude termination.[5] Mother's Brief at 13, 14. Mother did not raise this argument before the orphans' court or in her concise statement of errors complained of on appeal, and has therefore waived its review on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *In re B.C.*, 36 A.3d 601, 605 (Pa. Super. 2012) (finding

---

[5] The record reflects that Children are African-American and their foster parents are Caucasian.

that Father waived claims raised on appeal based upon his failure to raise them at the TPR hearing).

The record reflects that Children have done very well in the care of their foster parents; they have had all of their health-related needs met; and by all accounts, they are thriving. While Children have a relationship with Mother, there is nothing to suggest that terminating Mother's parental rights would have a damaging effect upon them. To the contrary, Dr. O'Hara previously concluded that Children are "primarily attached" to their foster parents. CYF Exhibit 5 (Dr. O'Hara's Report of August/September 2013), at 18. Children refer to their foster parents as "mommy" and "daddy," and have repeatedly expressed their desire to remain in their foster parents' care. *See* CYF Exhibit 5 (Dr. O'Hara's Report of June 2014), at 21, 23, 25, 26. The record therefore supports the orphans' court's determination that Children's needs and welfare are met by terminating Mother's parental rights.

The evidence of record supports the decision by the orphans' court to terminate Mother's parental rights to Children pursuant to section 2511(a)(8) and (b) of the Adoption Act. Therefore, no relief is due.

The final two issues raised by Mother on appeal concern the placement of Children with their foster parents instead of with Maternal Grandmother and the permanency goal of adoption as opposed to permanent legal

custodianship. The orphans' court states that these issues are waived. Orphans' Court Opinion, 5/15/15, at 10. We agree.

As the orphans' court correctly observes,

> [E]vidence and concerns regarding placement issues are not relevant for purposes of assessing the grounds for termination pursuant to 23 Pa.C.S.A. § 2511. Rather, the focus of a termination proceeding is on the conduct of the parents and whether the county agency has satisfactorily borne its statutory burden for termination under Section 2511; not to review the [j]uvenile court proceedings[;] the issues and purposes of the proceedings before the [j]uvenile court and the [o]rphans' court are wholly distinct.

*Id.* (citing *In re J.A.S.*, 820 A.2d 774, 780-81 (Pa. Super. 2003)). The dependency order entered by the juvenile court on February 18, 2015 changed the permanency goal for Children from reunification to adoption and addressed the placement of Children. This order was a final, appealable order. *See In re D.S.*, 102 A.3d 486, 487 n.1 (Pa. Super. 2014) (indicating that an order granting or denying a change in placement in a dependency proceeding is a final, appealable order); *In re C.J.R.*, 782 A.2d 568, 569 (Pa. Super. 2001) (stating that an order changing a dependent child's permanency goal is final and appealable). Mother did not appeal from the juvenile court's order. As such, these issues are not properly before this Court in this appeal.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/11/2015</u>